IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

**DERRICK J. KING**                                                    **PLAINTIFF**

**vs.**                                                    **NO. 3:11-CV-403-CWR-FKB**

**THE BOARD OF TRUSTEES OF STATE
INSTITUTIONS OF HIGHER LEARNING
OF THE STATE OF MISSISSIPPI d/b/a
UNIVERSITY OF MISSISSIPPI
MEDICAL CENTER and HENK de
WEERDT**

                                                    **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

Before the Court is the Defendants' motion for summary judgment.  Docket No. 61.  The

Plaintiff opposes the motion.  Docket No. 64.  The Defendants have filed a rebuttal brief, Docket

No. 67, and the matter is ready for review.  The motion is hereby granted in part and denied in

part.

## PROCEDURAL HISTORY

Plaintiff Derrick King filed this case on July 1, 2011.  Docket No. 1.  He filed a second

amended complaint on December 9, 2011.  Docket No. 20.  In his complaint, he invokes Title

VII of the Civil Rights Act against the University of Mississippi Medical Center (hereinafter

"UMMC") and claims under 42 U.S.C. §§ 1981 and 1983 against UMMC's Chief Technology

Officer, Henk de Weerdt (hereinafter "de Weerdt") individually.[1]  He filed suit against the Board

of Trustees of State Institutions of Higher Learning (hereinafter "IHL"), UMMC, and de Weerdt

---

[1] In a prior decision by this Court, the Court explained how the § 1981 claim could proceed against de Weerdt individually, *see* Docket No. 22, at 5-6; *King v. Bd. of Trustees of State Institutions of Higher Learning*, 2012 WL 2870789, at *3 (S.D. Miss. July 11, 2012), while no such claim could proceed against the state defendants, e.g. IHL and UMMC.  *See Meredith v. Jackson State Univ.*, No. 3:09cv303, 2010 WL 606402, at *2 (S.D. Miss. Feb. 17, 2010) (university is arm of the state and Eleventh Amendment bars claims against it under Sections 1981 and 1983).  In addition, de Weerdt could not be individually liable under Title VII.  Docket No. 22, at n.2 (citing *Kent v. Vicksburg Healthcare, LLC*, No. 5:10cv195-DCB-RHW, 2012 WL 1556511, at *6, n. 18 (S.D. Miss. April 30, 2012)).

and requests damages for claims arising from Plaintiff's allegations that he was not promoted and was eventually terminated from UMMC.  Plaintiff alleges that de Weerdt is liable for race discrimination and retaliation for filing an EEOC charge in violation of 42 U.S.C § 1981, and for violating the Fourteenth Amendment to the U.S. Constitution, actionable under 42 U.S.C. § 1983.  His amended complaints also allege that de Weerdt is liable for malicious interference with employment.

## BACKGROUND

King was hired as a systems analyst in the department of pathology by UMMC in July 2008.  Plaintiff is a black male. Plaintiff remained in his position until his employment at UMMC came to an end when UMMC implemented a reduction in force plan (hereinafter "RIF") in 2010.

### A.  Reduction in Force

Defendants have provided evidence indicating that, in 2009, Charlie Enicks, the new chief operating officer (COO) of UMMC, decided to consolidate the information technology (IT) department into one management group.  Prior to the consolidation, UMMC had a central IT division and each department hired its own IT staff.   Defs.' MSJ, Docket No. 62, at 2; de Weerdt Dep. at 21.  The departments of medicine, pathology, pediatrics and cardiology each had its own IT staff who were not part of the central group.  De Weerdt testified in his deposition that the structure created problems because each IT department had its own policies and standards and was not connected to the general direction of central IT.  UMMC implemented a Reduction in Force Business Plan which consolidated all of the IT positions under the management of central IT; a total of twenty positions were eliminated.  *See* RIF Business Plan, Docket No. 61, Ex. B. As a result of the RIF, four employees were unable to find positions and continue employment at

2

the medical center.  *See* de Weerdt Dep., Docket No. 61,  Ex. A, at 55.  Three of the employees were white, and one, the plaintiff, was black.

Before the reduction in force went into effect, Plaintiff applied for a position entitled Supervisor of Client Service Operations (hereinafter "Supervisor") on February 18, 2010. UMMC has submitted evidence that, originally, seven applicants applied for the position: three whites, two blacks, one Hispanic and one Asian.  *See* EEO Summary, Docket No. 61, Ex. D. One white and one black applicant withdrew their applications from consideration.  The Asian applicant was disqualified in a pre-screening process.  The remaining four applicants – two whites, one Hispanic, and one black applicant (the Plaintiff) – were interviewed; the interview panel selected Russell Donald, a white male applicant, to fill the position.

Plaintiff testified that he heard rumors of a department restructuring around June 2010 and those rumors were confirmed when UMMC informed all affected employees of the reduction in force, which went into effect on June 17, 2010.  That same day, King applied for six upper-level management positions.  *See* Derrick King's application history, Docket No. 61, Ex. G.  He also filed his Charge of Discrimination with the EEOC, complaining of race discrimination.  *See* EEOC Charge, Docket No. 61, Ex. H.

B.  EEOC Charge

King filed a charge of discrimination with the EEOC on June 17, 2010.  In the charge, he asserted that he had been discriminated based on his race having "been repeatedly denied promotions, and these promotions have been given to white males."  Docket 64-12.  He further explained that he did not "see any non-race-based reason for these denials of promotions."  *Id*. Although his charge alluded to other positions, he focused particular attention on the position of Supervisor of Client Service Operations, which had been filled within the last 180 days by

Donald, whom King claimed was less qualified than him. *Id.* He concluded the charge, with the following request: "I request the EEOC to investigate to determine whether I have been the victim of race discrimination in violation of the Civil Rights Act of 1964." *Id.*

On June 18, 2010, King applied for another position. Docket No. 61, Ex. G. In his deposition, though, Plaintiff conceded that he is only suing based on the denial of the Supervisor of Client Services Operations position, and not based on the applications that he filed for other positions.[2] King Dep., Docket No. 61, Ex. I, at 45-46.

King's system analyst position was eliminated during the RIF along with nineteen other positions. Having not been selected for any of the positions for which he applied, King's employment ended on August 19, 2010. The EEOC conducted its investigation and, at King's request, issued its Notice of Right to Sue on April 5, 2011. He timely filed the instant action.

## LEGAL STANDARD

The Defendants have filed a motion to dismiss, or in the alternative, for summary judgment. Since the Court is considering matters outside the pleadings, the motion must be treated as one for summary judgment. *First Bank and Trust v. Employers Mut. Cas. Co.*, 3:08cv685-CWR-LRA, 2011 WL 4916428, at *2 (S.D. Miss. Oct. 17, 2011) (citing Fed. R. Civ. P. 12(d)).

A. Summary Judgment

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). Facts

---

[2] "Q: Is your intent in the lawsuit to file on the fact that you didn't get the promotion to the supervisor client/services and the termination?
A: Yes.
Q: Okay. Any of these others?
A: No."
*See* King Dep., Docket No. 61, Ex. I, at 45-46.

are "material" when they might affect the outcome of the case, and a "genuine issue" exists when the evidence would allow a reasonable jury to return a verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party is "entitled to judgment as a matter of law" when the non-moving party fails to make an adequate showing on an essential element for which it has the burden of proof at trial. *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805-06 (1999) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The Court will "view the evidence and draw reasonable inferences in the light most favorable to the non-movant," *Maddox v. Townsend & Sons, Inc.*, 639 F.3d 214, 216 (5th Cir. 2011) (citation omitted), but conclusory assertions are not competent summary judgment evidence. *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994).

In ruling on a motion for summary judgment, the court will not weigh evidence or draw from the facts legitimate inferences for the movant. *Strong v. Dept. of Army*, 414 F.Supp.2d 625, 628 (S.D. Miss. 2005). Evaluating credibility and drawing factual inferences are functions reserved for the jury. *Id.* Particularly within the fact-sensitive realm of Title VII litigation, "[t]his Court is ever mindful that although a useful device, summary judgment 'must be employed cautiously because it is a final adjudication on the merits.'" *Patton v. Hinds Cnty. Juvenile Detention Ctr. (Henley-Young)*, No. 3:10-CV-138, 2011 WL 2912897, at *3 (S.D. Miss. July 18, 2011) (quoting *Jackson v. Cain*, 865 F.2d 1235, 1241 (5th Cir. 1989)). *See also Coleman, Sr. v. CMH Homes, Inc.*, No. 4:09cv168-CWR-KFB, 2011 WL 198130 (S.D. Miss. Jan. 20, 2011) ("[S]ummary judgment is an inappropriate tool for resolving claims of employment discrimination which involve nebulous questions of motivation and intent . . . and motivation and intent depend on complicated inferences from the evidence and are therefore peculiarly within the province of the factfinder.") (quoting *Thornbrough v. Columbus Greenville*

*R.R. Co.*, 760 F.2d 6333, 640-41 (5th Cir. 1985), *abrogated on other grounds*, *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993)).  Therefore, "[e]ven if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes the better course would be to proceed to full trial."  *Firman v. Life Ins. Co. of N. Am.*, 684 F.3d 533, 538 (5th Cir.2012) (citations and quotation marks omitted).

## <u>DISCUSSION</u>

### I.  Claims Against UMMC

Plaintiff has filed suit against UMMC under Title VII, alleging race discrimination, on three grounds.  First, he alleges that race discrimination influenced UMMC's failure to promote him to the Supervisor of Client Services Operations.  He also alleges that his termination as a systems analyst resulted from race discrimination; and that he suffered retaliation for filing a Charge of Discrimination with the EEOC.  We will address each issue in turn.

### A.  Race Discrimination Under Title VII

At the summary judgment stage, plaintiff need not present a prima facie case of discrimination, but must simply raise a genuine issue of material fact as to the existence of a prima facie case.  *Thornbrough v. Columbus & Greenville R. Co.*, 760 F.2d 633, 641 n.8 (5th Cir. 1985).  To establish a prima facie case for unlawful race discrimination for the failure to promote, a plaintiff must prove that: 1) he is a member of a protected class; 2) he applied and was qualified for a job for which the employer was seeking applicants; 3) despite his qualifications, he was rejected; and 4) after his rejection, the position was filled by someone of a different race or remained open and the employer continued to seek applicants from persons of complainant's qualifications.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Haynes v. Pennzoil Co.*, 207 F.3d 296, 300 (5th Cir. 2000); *Celestine v. Petroleos de Venezuella*

*SA*, 266 F.3d 343, 354-55 (5th Cir. 2001).   A plaintiff must carry this initial burden by a preponderance of the evidence.  *Haynes*, 207 F.3d at 300.[3]

The Defendants do not dispute that Plaintiff is a member of a protected class, in that he is African American; that he applied for a job for which the employer was seeking applicants; that he was ultimately rejected; and that the position was filled by someone of a different race.  As will be discussed more fully below, King was qualified for the position, but Defendants suggest that the position went to Donald for legitimate nondiscriminatory reasons in exercise of their business judgment.   In evaluating those reasons, some discussion of the candidates' qualifications is necessary.

Courts have held that, when the stated qualifications for the position at issue are objective, such as a specific degree or experience requirement, a plaintiff must show that he or

---

[3] The Defendants have argued that, because this case involves a reduction in force, the *McDonnell-Douglas* test is altered.  The Fifth Circuit has indicated that plaintiffs who are laid off are incapable of proving the fourth prong of the *McDonnell-Douglas* test, which is actual replacement by someone outside of the protected group.  *See Amburgey v. Corhart Refractories Corp., Inc.*, 936 F.2d 805, 812 (5th Cir. 1991); *Thornbrough*, 760 F.2d at 642, *abrogated on other grounds by St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993).  Under this line of cases, "a plaintiff must (1) satisfy the standing requirements of the statute by showing that he is within the protected group and that he has been adversely affected—e.g., discharged or demoted—by the employer's decisions; (2) show that he was qualified to assume another position at the time of the discharge or demotion; and (3) produce 'evidence, circumstantial or direct, from which a factfinder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue.'"  *Thornbrough*, 760 F.2d at 642 (quoting *Williams v. Gen. Motors Corp.*, 656 F.2d 120, 129 (5th Cir. 1981)).  The reasoning is that, under the traditional prima facie case, the plaintiff "need not introduce any evidence, either direct or circumstantial, that the employer in fact engaged in intentional discrimination" because "discrimination is presumed from his replacement."  *See Thornbrough*, 760 F.2d at 642.

However, the Defendant's reliance on this modified prima facie case is misplaced.  In a typical reduction-in-force case, the plaintiff's position was eliminated, the plaintiff is laid off, and the plaintiff has not been replaced by anyone.  In this case, however, the Plaintiff was laid off, he applied for *another* position, and that position was filled by someone of a different race.  The Plaintiff's claim is based on the refusal to promote him to another position, not the loss of the Plaintiff's previous position.  Plaintiff has argued that the Defendants failed to promote him on the basis of race – the classic Title VII claim.  The implication is that, if UMMC had promoted the Plaintiff, he would not have been dismissed as a result of the reduction in force because the Supervisor of Client Service Operations position that he would have received was not eliminated; thus, he would have remained employed.  The altered prima facie case for suits involving reduction in force does not apply here because there is in fact someone who filled the position which Plaintiff was denied.  *See Celestine*, 266 F.3d at 354-55; *Williams v. Gen. Motors Corp.*, 656 F.2d 120, 128 (5th Cir. 1981) ("Reduction-in-force cases are obviously outside the embrace of [*McDonnell Douglas* ] since reduction-case plaintiffs are simply laid off and thus incapable of proving the third [*McDonnell Douglas* ] element, *i.e.*, actual *replacement* by a younger employee.") (emphasis in original).  Thus, this Court applies the traditional prima facie case for failure to promote, and it will address the reduction in force where it is relevant.

she meets the stated qualifications as part of the prima facie case. *Johnson v. Louisiana*, 351 F.3d 616, 622 (5th Cir. 2003) ("An employer may establish job requirements, and rely on them in arguing that a prima facie case is not established because the employee is not 'qualified.'"); *Davis v. Dallas Indep. Sch. Dist.*, 448 F. App'x 485, 491 (5th Cir. 2011). The plaintiff need only meet the minimum qualifications for the position to make a prima facie case. *Forteneaux v. Shell Oil Co.*, 289 F. App'x 695, 697 (5th Cir. 2008); *Khadivi v. Jackson State Univ.*, 128 F. Supp. 2d 969 (S.D. Miss. 2000) (granting summary judgment based on plaintiff's failure to establish prima facie case where he did not meet the "minimum qualifications" for the position). An inquiry into the comparative qualifications of the plaintiff and the person selected over him may be made during the employer's rebuttal. *See Walker v. Mortham*, 158 F.3d 1177 n.29 (11th Cir. 1998) ("Since *Burdine*, we have continually recognized that relative qualifications belong in the rebuttal stage of the *McDonnell–Douglas* framework, not the prima facie stage.").

In this case, UMMC posted the requirements and skills sought for the Supervisor position at issue. The minimum requirements were listed as follows: "Bachelor's degree in systems administration, computer science, management information systems, or related field and five (5) years of related experience or equivalent combination of education/experience." Pl.'s Ex. 12. Plaintiff Derrick King earned a bachelor's degree in psychology from the University of Mississippi in 1993. He also received a master's degree in management information systems ("MIS") from Strayer University in 2009. King's Job Application, Docket No. 61, Ex. L. It is undisputed that Plaintiff had more than five years of related experience. *See id.*, at p. 6 of 6 (applicant reporting that he had "at least Seven (7) years" experience). While Plaintiff did not have a bachelor's degree in one of the fields listed, his master's degree in MIS and his experience working in various information technology positions since 2002 provided him with

an "equivalent combination of education/experience" to at least meet the minimum requirement. In fact, UMMC had a screening procedure in which its human resources department evaluated all of the applications for a position to make sure that applicants met the minimum qualifications before allowing them to receive an interview.  At least one other applicant for this position was "system disqualified," the term used to describe an applicant whom HR has found lacks the minimum qualifications based on their application, and he was not allowed to interview.  *See* EEO Summary, Docket No. 61, Ex. D, at p. 3 of 3.  The Defendants concede that King's application went through and passed this screening.[4]  Based on the record evidence and relevant standards, Plaintiff has established a prima facie case for his claim of race discrimination for failure to promote under Title VII.

### 1. Defendants' Proffered Reasons

Given that King has succeeded in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Burdine*, 450 U.S. at 253.  Defendants have come forward with different non-discriminatory justifications for the non-selection of Plaintiff for the Supervisor position.  Defendants contend primarily that the choice was made because "Plaintiff did not have microsoft [sic] or supervisory experience."  Def. Mem. In Supp. of MSJ, Docket No. 62, at 10.  But Plaintiff has provided evidence which calls into doubt those reasons.

---

[4] As for the lack of a bachelor's degree in a related field, Defendant UMMC has not followed this requirement in this case, even with the person who was actually hired for the Supervisor position.  Russell Donald also holds a bachelor's degree in psychology, but he holds no other degrees.  Neither party has argued that psychology would be considered a "related field" by the hiring staff at UMMC. Thus, both he and Plaintiff do not have bachelor's degrees in the fields listed in the job posting.  When the defendants have relaxed the educational qualification to the benefit of one applicant for the same position, it must hold the other applicants to the same standard. *See Wilburn v. Dial Corp.*, 724 F. Supp. 521, 529 (W.D. Tenn. 1989) ("[A] genuine issue of fact exists as to whether the plaintiff was the victim of disparate treatment in light of the fact that the defendant chose to relax one of the required qualifications in considering [the applicant hired] for the disputed position, but refused to do the same for the plaintiff.")

"[T]he defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection."  *Id.* at 255.  A defendant employer may introduce evidence that the person actually promoted to the position at issue was more qualified than the plaintiff.   The standard for this type of evidence, however, is set high because "differences in qualification are generally not probative evidence of discrimination unless those disparities are 'of such a weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'" *Celestine*, 266 F.3d at 357 (quoting *Deines v.Tex. Dept. of Protective and Regulatory Srvs.,* 164 F.3d 277, 280-81 (5th Cir. 1998)).   Under Title VII, an employer is also free to choose among equally qualified candidates as long as the employer does not apply unlawful criteria.  *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 259 (1981).

In this case, Plaintiff has produced ample unrebutted evidence that he was objectively qualified for the position, and has raised an issue of fact about whether Defendants' reasons are legitimate and not a pretext for discrimination.  To rebut the prima facie case, Defendants have argued that Plaintiff simply was not "qualified" for the Supervisor position.  They have provided multiple reasons for the decision not to select King for the promotion: that they did not consider education at all as a relevant factor, but weighed technical experience instead; that they believed that King did not have the requisite experience with Windows-based operating systems; and that he did not have enough supervisory experience as compared to Donald's supervisory experience at BankPlus.  Each of these reasons is not compelling, particularly when viewing them through the prism of a motion for summary judgment.

*a.  Education Not Considered Relevant*

The job posting summary for the Supervisor position emphasized that the position required a certain level of education.  The minimum requirements for the position included either a bachelor's degree in a specific technical field or a "related field" and some experience or an "equivalent combination of education/experience."  Pl.'s Ex. 12, at p. 3 of 7.  As indicated above, both King and Donald have a bachelor's in psychology. While Donald has no formal education beyond that degree, King has a master's degree in MIS.  During the pre-screening process, UMMC's HR department accorded "qualifying points" to applicants based on their level of education.  *See* Pl.'s Ex. 12, at p. 4 of 7. An applicant who had completed a master's degree received 120 points.  Indeed, there is no category to award points to someone who has only a bachelor's degree in psychology, and Donald obviously had fewer qualifying points than Plaintiff in this regard.[5]

Despite the importance of education as a minimum requirement for the Supervisor position, all of the members of the interview panel testified and the record indicates that they valued technical expertise above education, or did not consider education at all.[6]  The interview panel consisted of Defendant Henk de Weerdt, UMMC's Chief Technology Officer; James Burns, the hiring manager for the Supervisor position; and Chris Hankins, formerly a network engineer and, at the time of his deposition, a staff member in the Office of Information Security

---

[5] According to the form, the most relevant categories for someone in Donald's position would be the following: applicants who have "[r]eceived High School Diploma or GED" receive 40 points; those who have "[c]ompleted at least 120 [semester] or 180 [quarter] Units, but did not grad [sic] college" receive 80 points; those who have "[c]ompleted associate's degree" receive 70 points; and those who have "[c]ompleted Bachelor's Degree in Systems Administration, Computer Science, Management Information Systems, or related field" receive 100 points.  An applicant with a bachelor's degree in psychology does not fall squarely within any of these fields other than the first for applicants with a high school diploma, which only awards 40 points.  The record does not indicate what amount of points Donald received, but it is clear that King qualified to receive 120 points and that Donald qualified for fewer than 120 points.  This point system indicates the importance that UMMC ostensibly placed on education when determining who was qualified for this position–a level, as noted below, which the interview panel agrees that it ignored.

[6] *See* Defs.' Reply to P.'s Response to MSJ, Docket No. 67, at 4 ("Henk deWeerdt [sic], James Burns, Chris Hankins, and even Russell Donald, all testified in their depositions that technical expertise was more important than a master's degree.").

at UMMC.  In his deposition, Hankins testified that he believed that he was qualified to evaluate a candidate's qualifications for an information technology ("IT") position, but he stated, "I don't know what you go through a master's in IT for . . . I don't know what the training is." Hankins Dep., Docket No. 67, Ex. A, at p. 4 of 6.  He also testified that he could not determine whether one candidate for a position is "clearly better qualified" than another based on education.  *Id.*

Defendant de Weerdt also provided conflicting statements about the relevance of King's education credentials.  De Weerdt testified that he "did not look at the education" when comparing King and Donald.  De Weerdt Dep., Docket No. 64, Ex. F, at 39.  In his deposition, he testified that he was not concerned with whether King held a "piece of paper"–a degree–in information systems, *id.* at 40, and he did not consider education at all.  *Id.* at 39.[7]  The record indicates, however, that at another point, de Weerdt contended that he considered the candidates' education.  A UMMC HR manager documented a communication with de Weerdt in which she states:  "I met with hiring manager Henk de Weerdt, on June 25, 2010 to discuss the selection process for each requisition that Derrick [King] applied to.  Henk stated that *he made his selection based on the education* and directly related experience needed for the position." Correspondence from Beverly Washington, Docket No. 64, Ex. J (emphasis added).  This evidence of a changing story raises an issue of fact as to the basis of Defendants' decision.  *See Gee v. Principi*, 289 F.3d 342, 34-48 (5th Cir. 2002) (an employer's inconsistent explanations for

---

[7] De Weerdt testified as follows:

> A: I did not look at educational experience, because my gut feeling that I've – with many people I've interviewed in terms of studying information systems, even a master's degree, that it is, in a general sense, is strategic, it's not technical.
> Q: I think what you told me is you just didn't look at that criteria at all.
> A: No. . . . I'm saying, for me, I did not look if he had a piece of paper because, again, the status between wherever you got your degree – I mean, if you had a master's degree from MIT or whatever, or Stanford, maybe I would have looked at it differently.

De Weerdt Dep., Docket No. 64, Ex. F, at 39-40.

its employment decisions at different times permits a jury to infer that the employer's proffered reasons are pretextual); *Nasti v. CIBA Specialty Chem. Corp*., 492 F.3d 589, 594 (5th Cir. 2007) (court may infer pretext where defendant has provided inconsistent or conflicting explanations for its conduct); *Dandridge v. Chromcraft Corp.*, 914 F. Supp. 1396, 1403 (N.D. Miss. 1996) ("The 'change of story' evidence alone is certainly enough to create a question of fact as to the credibility of the defendant's proffered reason.").

To the extent that certifications constitute education, the record indicates that King held at least three IT-related certifications at the time of application for the position, while Donald held none.[8]  Once left to evaluate how defendants weighed or even considered King's education, a jury may view with jaundiced eyes the other reasons proffered by defendants and conclude that they too are merely pretextual reasons.

### b.  Lack of Windows Experience

The parties agree that both Donald and King have experience in multiple operating systems.  The dispute relates specifically to experience with Windows-based systems.  The Defendants have presented evidence that, in 2010, UMMC was undergoing a transition to only using Windows-based programs and that it was critical that they have someone with Windows experience.  *See* de Weerdt Dep., Docket No. 61, Ex. A, at 28.[9]  Defendants argue that King did not have the necessary experience with Windows that the Supervisor position required.  In their

---

[8] *See* King Job Application, Docket No. 61, Ex. L; Plaintiff's Certifications, Docket No. 64, Ex. I (Cisco CCENT (career certification); Novell CNA (administrator certification); CompTIA A+). A certification for ITIL entered into the record indicates that he passed the required course July 2010, after he had applied for the position in February 2010.  Unquestionably, the certifications represent proof of some additional training/education that King had received. *Cf.* Donald Job Application, Docket No. 64, Ex. N, at p. 2 of 5 (no certifications listed).

[9] De Weerdt testified that, during the process of hiring for the Supervisor position, UMMC was transitioning from Novell to Microsoft.  The central IT department was "way ahead than the departments" and "[t]he departments were all still Novell."  *Id.*  De Weerdt implies that most of the staff who had only worked in the departments at UMMC, but not in central IT or had other training, were familiar with Novell, but not with Windows.  *Id.*  ("The departments were all still Novell. They have not been converted.  They have not been exposed at all.")  This testimony suggests that de Weerdt may have believed that King might not have sufficient Windows experience based on the fact that he was applying for a position from an IT department outside central IT at UMMC.

opening brief, they state: "Russ Donald received the supervisor of client services position due to his experience with Microsoft and his supervisory experience, **both of which King did not have.**"  Docket No. 62, at 11 (emphasis added).   The record, however, indicates that this requirement for the position is in doubt.  Nowhere in the job posting summary does it indicate that a candidate for the position must or even should have experience with Microsoft or Windows[10] operating systems.  *See* Job Posting, Docket No. 61, Ex. J, at p. 1. (detailing "Position Summary"); Pl.'s Ex. 12, at p. 3 of 7 (detailing "Special Knowledge, Skills & Abilities" for the position").  To the contrary, it describes technical skills and the ability to ensure server accessibility "across *multiple* platforms" and processes.  *Id*. (emphasis added). King's certifications in at least three other operating systems at the time of his interview suggest that he could have met this requirement.

Aside from that point, however, Defendants argue that Donald was chosen because he "had extensive experience in Windows based applications" and that Plaintiff did not indicate that he had Windows experience at the time he applied for the position.  Defs.' Reply to Response to MSJ, Docket No. 67, at 2-3. Despite the Defendants' contention, the record includes ample evidence that King did in fact have Windows experience that the interview panel knew or should have known about.  King's job application indicates that he had "install[ed] and configured Windows 2003 [and] Windows 2008 Servers" in his position as systems analyst at UMMC; "install[ed] and configure[d]. . . Windows servers" as network administrator in the Pontotoc City School District; and "install[ed], configure[d], and manage[d] Windows LANs for area small businesses and churches" as a technical specialist at ComPuTech.  Docket No. 61, Ex. L.

---

[10] The parties have referred to "Microsoft" and "Windows" interchangeably.  *See, e.g.*, Def. MSJ, Docket No. 62, at 10 (quoting Burns Deposition wherein Burns refers to King's lack of "Windows" experience and Defendants' argument that King lacked "Microsoft" experience).  Therefore, the Court will equate the terms to refer to the same system or entity.

The Defendants have presented testimony from Burns and de Weerdt that they asked King about his Windows experience in the interview and that he stated that he did not have any.[11]   King, however, denies this contention and declares that he told them that he had Windows experience.[12]   Essentially, not only did King's application show that he had Windows experience, according to King, he specifically told the interviewers of his Windows experience. In light of this evidence, a jury would be left with the obligation of testing the Defendants' assertions that King had "no" Windows experience and the assertion that Donald has more experience with Windows than King.

The record evidence raises questions about the credibility of the Defendants' proffered, non-discriminatory reason and whether it amounts to a pretext for discrimination.  And it is those kinds of credibility determinations which rest within the province of a jury.  *See Anderson*, 477 U.S. at 255; *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000).

### c. Lack of Supervisory Experience

The Defendants' other proffered reason is that Plaintiff did not have any supervisory experience.  Burns, the hiring manager for the Supervisor position, submitted an affidavit stating that "[e]ach applicants [sic] supervisory experience was important," along with their "technical skills."  Burns Aff., Docket No. 61, Ex. F.  The Defendants argue that, while King did not have any supervisory experience, Donald had significant experiences.  According to the record,

---

[11] Burns testified that, in addition to not having any supervisory experience, King "had no Windows experience.  It was all UNIX [another operating system], from what we had [on the application] and what he told us."  Docket No. 61, Ex. E, at 21.  De Weerdt recalled asking King questions about his technical experience in the interview: "[King] said, I never worked with Windows Clustering.  I asked him, and I said, 'Another thing this group do is Active Directory.  Have you worked with Active Directory?'  He said, 'I've never worked with Active Directory.'"  De Weerdt Dep., Docket No. 61, Ex. A., at 29.  Based on the Defendants' opening brief, it appears that Active Directory is a Windows program.  The brief provides a chart of "Microsoft Experience" that they argue that Donald had and "Active Directory Integration" is listed among other programs.  Def. Memo. to MSJ, Docket No. 62, at 11.

[12] In his deposition, King testified: "They asked me a series of questions about my skills, what did I know. If I knew the Windows side of networking, **which I replied to them, yes**."  Docket No. 64, Ex. A, at 29 (emphasis added).

Donald worked at BankPlus before starting his position at UMMC as a system administrator intermediate in April 2005.  *See* Donald Job Application, Docket No. 61, Ex. N, at 3.  Donald testified that, while at BankPlus, he was "put as lead over the second tier support or production support and  the mainframe. My duties included managing all of the system and the people that managed those systems for the bank . . ."  Donald Dep., Docket No. 61, at 16.  He also indicated that he supervised four employees when he supervised the production support group.  *Id*. at 17.  According to the Defendants, Donald served as "team lead for the application packaging and deployment team in client server operations" in his role at UMMC.  Defs.'Reply, Docket No. 67, at 5.  Donald testified that, in that role, "I had four people under me, and my job was to manage the daily operations and how those people maintained all of the application delivery for University Hospital."  Donald Dep., at 16.[13]

The record also indicates that King listed supervisory experience on his application.  On his application, King indicated that he had "managerial skills" which included "supervision of technicians" and "project management."  Docket No. 61, Ex. L, at 2 of 7.  He indicated that, in his position as technology coordinator/network administration in the Choctaw County Public Schools, he was a "manager of technicians."  *Id*. at 4 of 7.  Defendant de Weerdt testified that he recalled asking King about his supervisory experience:  "I said, 'Have you ever managed any people?'  And he said there was -- I think the group, team group was five or six.  I said, 'Have you ever managed a team of five or six?'  And he said no, he never did."  De Weerdt Dep., Docket No. 61, Ex. A, at 29.[14]

---

[13] Plaintiff argues that the extent of Donald's management experience is that Donald was "over a work crew with a landscaping company in high school, was the manager of a diner in college and was a lead person at BankPlus."  Pl.'s Response to MSJ, Docket No. 65, at 4 (citing Donald Dep., at 15).  It may be within the province of the jury to determine which experience is most relevant or to weigh this evidence.

[14] It should be noted that King's answer to the first part of de Weerdt's question is unclear, in that de Weerdt did not indicate whether King gave a "yes" or "no" answer to his question about having managed "any

Moreover, based on the job posting summary, it is also doubtful whether significant supervisory experience was as essential for the position as the Defendants now suggest, particularly in light of the defendants having ignored other objective criteria (*e.g.*, education). Indeed, the position is entitled "Supervisor of Client Service Operations," but the posting mentions very few specific supervisor-related skills expected from an ideal applicant. Under the list of "special knowledge, skills & abilities" for the position, there are at least eleven competencies. Only four of them describe non-technical skills: 1) "verbal and written communication skills;" 2) "interpersonal, *leadership*, project management, and customer service skills"; 3) "ability to convey technical information to non-technical personnel"; and, listed last, 4) the "ability to train, *supervise* and motivate employees." Job Posting, Pl.'s Ex. 12 (emphasis added). Indeed, only two of these competencies discuss leading and supervising other technical personnel. This difference between the job posting, which does not emphasize supervisory skills, and the level of emphasis that the interview panel now contends they placed on that aspect of the position should be tested before a jury in light of the similar experience supervisory experience between Donald and King.

The record presents a close call. The Court recognizes that Donald had some strengths and King had others. However, the inconsistencies in the record evidence raise credibility concerns, which are strictly for a jury to determine. In the present case, when "factual and legal issues present close calls under Rule 56. . . . [I]t is more prudent to carry the close issues forward and deny summary judgment." *Harris v. Bruister*, No. 4:10cv77-DPJ-FKB, 2013 WL 6805155,

---

people." In addition, Donald provided two instances in which he had managed four people (at BankPlus and at UMMC), but de Weerdt recalls asking King if he had ever managed "five or six" people, and King responded in the negative. The record does not indicate whether the same questions were asked of Donald. At least on these facts, neither Donald nor King provided evidence that they had managed "five or six" people in an IT capacity, so they may be similarly situated in this respect. But, to say that King had **no** supervisory experience does not match the record wherein his application and statements he claims to have made to de Weerdt detail his supervisory experience.

at *2 (S.D. Miss. Dec. 20, 2013).  *See also Haire v. United States*, 101 F. Supp. 2d 478, 485 (N.D. Miss. 2000) (where court found that plaintiff "only just barely" met her burden of establishing pretext, plaintiff was "entitled to present [the] claim to a jury.").

The plaintiff must still produce evidence that his race was a "determinative influence" in the Defendants' decision not to select him. "The plaintiff is left with the ultimate burden, which has never left him: that of proving that the defendant intentionally discriminated against him." *Moham v. Steego Corp.*, 3 F.3d 873, 875 (5th Cir. 1993).  He, however, is free to make this showing by pointing to enough evidence to permit the jury to reasonably disbelieve defendants' proffered reasons.  *Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1291 (11th Cir. 1998) (citing *Combs v. Plantation Patterns*, 106 F.3d 1519, 1537-38 (11th Cir. 1997)).   In other words, here the "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions" could lead a jury to find them unworthy of credence. *Jackson v. State of Alabama State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (citations omitted).  *Cf. Nasti*, 492 F.3d at 594 ("[T]he trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.  Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'") (citation omitted).

The Court, in view of all the evidence, believes the Plaintiff has cast sufficient doubt on the Defendants' nondiscriminatory reasons sufficient to allow a jury to determine that the Defendants' proffered legitimate reasons were not what actually motivated their conduct, *Staten v. New Palace Casino, LLC.*, 187 F. App'x 350, 359 (5th Cir. 2006), and ultimately a jury may find that King was discriminated against based on his race.  The Court finds that the Defendants'

proffered reasons create a genuine issue of material fact to be considered by a jury to determine whether the non-discriminatory explanation is a pretext for discrimination.   The defendants are not entitled to a judgment as a matter of law, the motion for summary judgment is denied, and in the exercise of its discretion, the Court finds that this issue shall be tried to a jury.  *Firman,* 684 F.3d at 538.

B.  Retaliation Claim

After Plaintiff did not receive the Supervisor position, he filed an EEOC charge.  *See* Docket No. 20, Ex. A.  Plaintiff  alleged that he had "been repeatedly denied promotions, and these promotions ha[d] been given to white males."  He further stated, "I do not see any non-race-based reason for these denials of promotions" and specifically referenced the hiring of a white male for the Supervisor position as well as denials for three other promotions.  *Id*.  Plaintiff argues that the Defendants knew that he had filed this charge when he applied and was interviewed for the open positions after the reduction in force ("RIF") was announced.

Under the "anti-retaliation" provision in Title VII:

"It shall be an unlawful employment practice for an employer to discriminate against any of his employees … because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

42 U.S.C. § 2000e-3.  To establish a prima facie case of retaliation, the plaintiff must show that: (1) he participated in activity protected by Title VII; (2) his employer took an adverse employment action against him; and (3) a causal connection exists between the protected activity and the adverse employment action.  *McCoy v. City of Shreveport*, 492 F.3d 551, 556-557 (5th Cir. 2007).  It is undisputed that the filing of an EEOC charge constitutes protected activity and that Plaintiff was not selected for the positions for

which he had applied.  The issue in dispute is whether Plaintiff has established a causal connection between the protected activity and the adverse action.

The timeline of events in this case is illuminating on this issue.  In either February or March 2010, Plaintiff interviewed for the Supervisor position.  In March 2010, the position was given to Donald.  According to the amended complaint, Plaintiff filed his EEOC charge on June 11, 2010.  Docket No. 20, at ¶ 9.  The EEOC received the charge on June 17, 2010.  *Id.*, Ex. A.  On June 17, UMMC also published its "Reduction in Force Business Plan," which eliminated several positions, including Plaintiff's position as systems analyst.  RIF Plan, Docket No. 61, Ex. B.  The EEOC gave Defendants notice of his claim of race discrimination on June 21, 2010.  *Id.*, Ex. C.  After the RIF was announced on June 17 and while the EEOC was investigating Plaintiff's race discrimination claim, Plaintiff states that he applied for eight open positions. Plaintiff stated that he was interviewed for two positions for which he had applied, but UMMC did not offer him either.  On August 19, 2010, Plaintiff was terminated.

Defendants argue that Plaintiff conceded in his deposition that "he is not suing due to his not receiving any" of the seven positions for which he had applied on or after June 17th.  However, Plaintiff only stated that he is not arguing that he did not receive the other positions "because of race."[15]  In this suit, Plaintiff has argued that he did not

---

[15] "Q: On June 17th, you filed six applications.
   A: Uh-huh (yes)
   Q: And then the 18th, you filed an additional one, which was the systems administrator-senior.  Are you alleging that any of those six that you filed on June 18th, that you didn't get *because of race*?"
   A: No.

*See* King Dep., Docket No. 61, Ex. I, at 45 (emphasis added).
   . . .
   Q: Is your intent in the lawsuit to file on the fact that you didn't get the promotion to the supervisor client/services and the termination?
   A: Yes.
   Q: Okay.  Any of these others?

receive the positions for which he had applied after the RIF because of *retaliation*, not because of race.[16]  Thus, this claim is preserved and the Court will address it.

As an initial matter, it is important to be clear that, from the pleadings and briefs, Plaintiff is not alleging that he did not receive the Supervisor position because of retaliation for filing an EEOC charge.  He interviewed for the position in February or March 2010, and he did not file an EEOC charge until June 2010.  Therefore, Defendants could not have denied him the Supervisor position for engaging in activity he had not yet done.  As for the other eight positions for which Plaintiff applied after the RIF was announced and he filed the EEOC charge, Plaintiff has failed to prove that he was not selected for any of these positions due to retaliation.

To establish a prima facie case of retaliation under Title VII, a plaintiff must show that (1) he participated in an activity protected under the statute; (2) his employer took an adverse employment action against him; and (3) a causal connection exists between the protected activity and the adverse action.  *McCoy v. City of Shreveport*, 492 F.3d 551, 556–57 (5th Cir. 2007).  However, if a defendant brings forward a legitimate, non-discriminatory reason for the adverse employment action, the burden shifts back to the plaintiff to produce sufficient evidence to show a reasonable trier of fact that the reason was the pretext for the employment action.  *McDonnell Douglas*, 411 U.S. at 804; *see*

---

A: No.”

*See id*. at 39.  Plaintiff applied for six open positions on June 17, 2010, the day the RIF was announced.  He applied for an additional position on June 18 and one on June 29, making a total of eight positions applied for after the RIF was announced.  *See* King’s Application History, Docket No. 61, Ex. G.  Defendants did not ask about the eighth position, but Plaintiff has not indicated on rebuttal that he is pursuing that claim in any specific way.  At any rate, the analysis herein applies to all of the positions for which Plaintiff applied on or after June 17.

[16] *See* Second Am. Compl., Docket No. 20, ¶ 11 (“Had it not been for race discrimination *and retaliation* against Plaintiff,  he would have been promoted to a higher position within the Technology Department and would not have been terminated from his employment.”) (emphasis added); *see also id*. at ¶¶ 14, 16 (pleading retaliation claims against de Weerdt and UMMC for filing EEOC charge).

21

*also Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1122 (5th Cir. 1998).  The Supreme Court has ruled that "Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e–2(m).[17] This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013).

It is uncontested that King established the first two elements of his prima facie case. He participated in a protected activity when he filed complaints with the EEOC, and his non-selection for the positions for which he applied constitutes an adverse action. The question before this Court is whether there is any evidence of the third element, a causal connection between the activity and the adverse action.

A plaintiff alleging retaliation may satisfy the causal connection element by showing "[c]lose timing between an employee's protected activity and an adverse action against him."  *Feist v. La. Dep't of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 454 (5th Cir. 2013).  The Fifth Circuit has generally found "a time lapse of up to four months" may be sufficiently close.  *Evans v. Houston*, 246 F.3d 344, 354 (5th Cir. 2001). In this case, Defendants have admitted that they knew that King had filed an EEOC charge when he applied for or was interviewed for the open positions after the RIF was announced.  King's employment at UMMC ended sixty-three days after King filed his EEOC charge.  Plaintiff argues that this temporal proximity is enough for a jury to infer causation.  Despite King's argument, "neither the presence nor the absence of temporal proximity is outcome-determinative in a Title VII retaliation claim."  *Sanders v.*

---

[17] 42 U.S.C. § 2000e-2(m) ("[A]n unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a *motivating factor* for any employment practice, even though other factors also motivated the practice.") (emphasis added).

*Sailormen, Inc.*, No. 3:10cv606-CWR-LRA, at *3 (S.D. Miss. Feb. 28, 2012) (citations omitted).

As for providing other reasons besides temporal proximity and UMMC's knowledge of his charge, Plaintiff has not provided any information about the circumstances surrounding the denial of the eight positions. He has provided no information about the qualifications required for the positions, the persons selecting applicants for the positions, his interviews or whether the qualifications of the other applicants were equal to his own or lesser–all of which he provided in litigating his claim of race discrimination for the Supervisor position.

He only argues that he applied for the jobs, he did not receive any of them, and it must be a result of retaliation. "This assertion is an *ipse dixit* and nothing more." *Diaz v. N.Y.C. Bd. of Elections*, 335 F. Supp. 2d 364, 367 (E. D. N.Y. 2004). *See also Douglas v. Cnty. of Tompkins*, No. 90-CV-841, 1995 WL 105993, at *13 (N.D.N.Y. 1995) ("Plaintiffs' response can best be summarized by the phrase *ipse dixit*; in other words, discrimination has been shown here because he says it has."). To flesh out his claim, he must demonstrate that the selecting individuals specifically knew about the EEOC charge. *See Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 684 (5th Cir. 2001) (requiring that plaintiff establish that the specific employee who terminated her knew about the protected activity to establish a causal link); *Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 884 (5th Cir. 2003) (requiring proof that "decisionmakers" for the employer knew about the protected activity). Plaintiff must also prove that "but for" the filing of his charge, he would have been offered any of these positions. *See Nassar*, 133 S. Ct. at 2533. "Absent any supporting evidence, the plaintiff's unsupported *ipse dixit*

does not create a triable issue of fact." *Clarke v. Wash. Metro. Area Transit Auth.*, 904 F. Supp. 2d 11, 17 (D.D.C. 2012).   Plaintiff has failed to establish a prima facie case of retaliation, and Defendants are entitled to summary judgment on this claim.

## II. Claims Against de Weerdt

### A.  Section 1981 Claims

Plaintiff has alleged that de Weerdt is liable for race discrimination and retaliation against him for filing an EEOC charge in violation of 42 U.S.C. § 1981.  Defendants have argued that de Weerdt is entitled to qualified immunity.

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a).  Section 1981's protections against race discrimination "include[] the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981(b).  Liability under Section 1981 liability "will lie against an individual defendant if that individual is essentially the same as the State for the purposes of the complained-of conduct." *Foley v. Univ. of Hous. Sys.*, 355 F.3d 333, 337 (5th Cir. 2003) (quotation marks omitted).  In addressing the claim of a public official to qualified immunity, courts engage in a two-step analysis.  First, the Court must determine whether the plaintiff has made a sufficient showing that the official violated a clearly established constitutional or statutory right.  If the answer is in the affirmative, the Court then considers whether the official's actions were objectively reasonable in light of the clearly established right.  *Id*. (citing *Siegert v. Gilley*, 500 U.S. 226 (1991)).

Individuals may be held liable for violations of 42 U.S.C. § 1981. *Grant v. Lone Star Co.*, 21 F.3d 649, 653 (5th Cir. 1994).  Whereas Title VII of the Civil Rights Act of 1964, as amended in 1991, prohibits discrimination by "employers," Section 1981 proscribes conduct by persons in general.

It is well settled that King has "a clearly established right to be free from racial discrimination in employment." *Jackson v. Houston Independent School District*, 189 F.3d 467, *7 (5th Cir.1999).  Thus, "the first prong of the test presents no hurdle."  *Patton v. Hinds Cnty. Juvenile Det. Ctr. (Henley-Young)*, 3:10-CV-00138-CWR, 2011 WL 2912897 (S.D. Miss. July 18, 2011).  Likewise, workplace discrimination on the basis of race is a course of conduct that is not "objectively reasonable under clearly established law."  *Blackwell v. Laque*, 275 Fed. Appx. 363, 367–68 (5th Cir. 2008). Therefore, qualified immunity on its own does not bar King's claim against de Weerdt. *See Hampton Co. Nat'l Sur., LLC v. Tunica Cnty., Miss.*, 543 F.3d 221, 229 (5th Cir.2008) ("There is no qualified immunity for racial discrimination as such discrimination is clearly unconstitutional.").

In order to avoid summary judgment, Section 1981 also requires that Plaintiff provide evidence that de Weerdt was *personally involved* in intentional discrimination against him.  *Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio*, 40 F.3d 698, 714 (5th Cir. 1994) (emphasis added).  "Personal involvement" includes personal direction of, authorization of, or *participation* in discriminatory conduct."  *Jackson v. Bayou Indus., Inc.*, No. 94-946, 1995 WL 133332, at *2 (E.D. La. Mar. 27, 1995) (citation omitted); *Wade v. Miss. Co-op. Extension Serv.*, 424 F. Supp. 1242, 1259 (N.D. Miss. 1976) (finding that essential elements of personal involvement and responsibility for actions complained of is necessary to subject defendants to individual liability).

In this case, Plaintiff has argued that de Weerdt was the "decision-maker as to the promotion and King's retention by UMMC." Docket No. 65, at 18. The record suggests a game of hot potato on this issue. De Weerdt testified that James Burns was the decision maker for the Supervisor position; Burns recommended that Russell Donald be offered the position and he agreed.[18] Burns, however, testified that all three members of the interview panel, including de Weerdt and Chris Hankins, agreed that Russell Donald was the better candidate, and that Burns did not recommend Donald first.[19] Despite these different accounts, the job posting clearly states that Burns was the hiring manager. Docket No. 61, Ex. J, at 2. Neither of these statements indicates that de Weerdt was the *sole* decision-maker, but he obviously was involved. Just how much influence he had over King's non-selection is something the jury will have to consider and ultimately the jury may find that de Weerdt is individually liable. *See Pettis v. Nottoway Cnty. Sch. Bd.*, No. 3:12cv864-HEH, 2013 WL 3063704, at *7 (E.D. Va. June 17, 2013) ("Allegations that the individual defendants were one of the decision-makers or centrally involved in the decision-making is enough to sustain a claim against an individual under § 1981").

There is no disagreement that there were three people on the interview panel, and that all three people had a role in that they all participated in the interview and agreed to select one person to receive the position. The Plaintiff must convince the jury that de Weerdt's role was unique and that he may have unduly influenced the process and therefore is individually liable.

---

[18] *See* de Weerdt Dep., Docket No. 67, Ex. C, at 33 (agreeing that "[a]fter the round of interviews, the manager James Burns . . . recommends -- he thinks we should offer the job to Russ Donald, to which you and Mr. Hankins concurred").

[19] "Q: It wasn't a situation, was it, Mr. Burns, where you said 'I want to hire this person, not Mr. King,' and everyone simply agreed with you?
     A: No.
     Q: You didn't make a recommendation before there was a consensus reached?
     A: No. I never do that. In fact, if I'm conducting the interview, it's always my opinion is last because I don't want anyone else to – just because it was my idea. . . . So I always ask their input first, before I say anything."

Burns Dep., Docket No. 64, Ex. K at 26.

Accordingly, the Court denies summary judgment as to de Weerdt's claim of qualified immunity.

### B.  Intentional Interference with Employment

Plaintiff has argued that Defendant Henk de Weerdt interfered with his application for a promotion to the Supervisor position.  He argues that de Weerdt was the decision maker for the promotion and whether King would be retained by UMMC and that he "prevented him from securing any other employment because of his race rather than any legitimate reason."

Under Mississippi law, the elements of tortious interference with an employment contract are as follows:

> 1) the acts were intentional and willful;
> 2) that they were calculated to cause damages to the plaintiff in his lawful business;
> 3) that they were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant; and
> 4) that actual loss occurred.

*Levens v. Campbell*, 733 So.2d 753, 760-61 (Miss. 1999).  "[T]he plaintiff must prove that the contract would have been performed but for the alleged interference."  *Par Indus., Inc. v. Target Container Co.*, 708 So.2d 44, 48 (Miss. 1998); *Grice v. FedEx Ground Package Sys., Inc.*, 925 So.2d 907, 910 (Miss. Ct. App. 2006).  "Further, [this] tort only arises if there is interference with the contract between plaintiff and some third party."  *Grice*, 925 So.2d at 910 (quoting *Nichols v. Tri–State Brick and Tile Co., Inc.*, 608 So.2d 324, 328 (Miss. 1992) (internal quotation marks omitted)).

The law also provides a qualified privilege to employees acting within the scope of their employment.  "[O]ne occupying a position of responsibility on behalf of another is privileged, within the scope of that responsibility and *absent bad faith*, to interfere with his principal's contractual relationship with a third person."  *Morrison v. Miss. Enter. For Tech., Inc.*, 798 So.

2d 567, 574 (Miss. Ct. App. 2001) (quoting *Shaw v. Burchfield*, 481 So.2d 247, 255 (Miss. 1985) (emphasis added).  It is not necessary for direct evidence to exist, such as an admission by the Defendant that he acted in bad faith. *Morrison*, 798 So.2d at 575.  Instead, such a conclusion generally arises as an inference from other evidence. *Id*. The conclusion, though, must be that the actor was malicious or recklessly disregarding the rights of the person injured. *Id*.

Similar to the discussion above, all parties agree that de Weerdt was involved in King's non-selection for the Supervisor position.  The record reveals inconsistencies about the nature and extent of de Weerdt's involvement, including whether he was the decision maker for King's promotion and retention by UMMC, and whether his reasons for failure to promote King are legitimate or pretextual.   The Court concludes that the record does not support a conclusion as a matter of law that Defendant de Weerdt did not act in bad faith in not selecting King for the Supervisor position. The burden rests on King to demonstrate to a jury that de Weerdt acted intentionally and with malice to interfere with King's employment relationship.  As a result, the Court also denies summary judgment on Plaintiff's state law claim of intentional interference with an employment contract.

## V.  CONCLUSION

For the reasons above, the motion is DENIED IN PART, as Plaintiff has raised a genuine issue of material fact as to whether race was a motivating factor for the denial of the Supervisor of Client Service Operations position by Defendant UMMC.  The motion is also DENIED IN PART as to Plaintiff's claims against Defendant Henk de Weerdt in his individual capacity, namely the claim of race discrimination under 42 U.S.C. § 1981 and the state law claim of intention interference with an employment contract.

The motion is GRANTED as to Plaintiff's retaliation claim in violation of Title VII.

**SO ORDERED**, this the 27th day of March, 2014.

s/Carlton W. Reeves
UNITED STATES DISTRICT JUDGE